IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPV-LS, LLC,<br><br>           Plaintiff,<br><br>vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>           Defendant and Third Party Plaintiff,<br><br>vs.<br><br>NACHMAN BERGMAN as TRUSTEE OF THE N BERGMAN INSURANCE TRUST dated December 18, 2006; MALKA SILBERMAN, as Successor Trustee of THE N BERGMAN INSURANCE TRUST dated December 18, 2006; LIFE TRADING TRUST dated August 8, 2007; T-LEG LLC a/k/a TLEG LLC; FINANCIAL LIFE SERVICES LLC; SPV II LLC; and THE REPRESENTATIVE OF THE ESTATE OF NANCY BERGMAN,<br><br>           Third Party Defendants. | Civil No. 16MC16<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH SUBPOENA ISSUED TO CHASE BANK, N.A. FOR BANK RECORDS OF GERALD L. KROLL**<br><br>**Date:** December 6, 2016<br><br>**Time:** 11:00 a.m.<br><br>**Courtroom:** Part 1 |

**Memorandum of Law in Support of Motion to Quash Subpoena Issued to Chase Bank, N.A. for Bank Records of Gerald L. Kroll**

Comes now Gerald L. Kroll, through counsel, and sets forth facts and legal authority establishing the basis for an Order quashing a subpoena issued to Chase Bank, N.A. ("Chase"), seeking his bank account records. Mr. Kroll is lead counsel for a party in the underlying litigation. Apparently,

the subpoena at issue was served on Chase at offices in New Jersey. This matter is brought before the Court here in the Southern District of New York because that is the location for production of the records pursuant to the terms of the subpoena as required by FRCP 45. The broad subpoena would require Chase to produce *all* of Mr. Kroll's bank accounts for the period from May 2009 to the present including records from his personal, other business, law firm and Client Trust accounts.

## INTRODUCTION

**1.    General Overview of the Unlawful Insurance Policy Purchase.**

The subpoena was issued by counsel for SPV-LS, LLC ("SPV"), which is a Delaware Limited Liability Company owned by a trust for the benefit of one Michael Krasnerman.   The Trust is located in South Dakota and takes direction from Mr. Krasnerman in regard to this litigation. The subpoena was issued by counsel for SPV-LS, LLC ("SPV"), which is a Delaware Limited Liability Company owned by a trust for the benefit of one Michael Krasnerman. The Trust is located in South Dakota and takes direction from Mr. Krasnerman in regard to this litigation.

SPV bought suit against Transamerica Life Insurance Company to obtain the policy proceeds of $10 million for a policy issued in 2007 on the life of Nancy Bergman, a retired middle school teacher.   In 2006, an insurance agent or broker named David Kohn and several others began a scheme to invest in various life insurance policies on the lives of elderly members of the Orthodox Jewish community in New York City. Nancy Bergman's grandson Nachman Bergman came into contact with David Kohn and eventually Nancy Bergman was duped into signing documents and providing information – much of which is not correct – enabling strangers to procure and invest in life insurance policies wagering on her life.   The Transamerica life insurance policy was one of five (5) such policies taken out

1

on the life of Ms. Bergman, engineered by the investors, with a total face amount of $37 million.

The scheme entailed obtaining a life insurance policy through a trust set up with Nachman Bergman as trustee and primary beneficiary, but designed to ensure that the Bergman family would not receive the policy benefits. The initial investors' intention was then to sell the policy to other investors or to obtain the proceeds upon Nancy Bergman passing before sale of the policy. Upon information and belief, those initial investors provided all the funding for the premiums on the Transamerica policy at issue.

The practice of selling life insurance policies for individuals who are not facing a terminal illness is called "life settlement" and such practices became regulated under New York law as of March 18, 2010. New York Ins. Law, Article 78, Ch. 499. Apparently, there had been a market for such policy sales prior to that time and that market suffered a significant downturn after the initial investors in the Transamerica life insurance policy obtained control of the insurance trust. Subsequently they could not achieve a sale and had trouble maintaining large premium payments on the policy. In distress, the policy was eventually the subject of a sales agreement between the insurance trust and an entity owned and controlled by Michael Kransnerman, an experienced and sophisticated investor in life settlements. Eventually a disagreement arose between the insurance trust (the initial investors in the Transamerica life insurance policy on Nancy Bergman) and the buyer, which resulted in litigation, bankruptcy filings by the insurance trust, and eventually a court-ordered sale of the life insurance policy. Critical to the Court in determining the subpoena issues here are specific facts and knowledge obtained by the purchasers of the policy. Because they knew that the policy was likely unlawful long before it was purchased, they are "doubling down" on their purchase to avoid losing it all – and to ultimately win a huge bet of

2

$10 million on the life of Nancy Bergman. The facts detailed below clarify that knowledge and the position of SPV coming into the litigation against Transamerica in the United States District Court for the District of South Dakota.

## 2.    SPV's Knowledge of the Transamerica Policy as STOLI.

*Two (2) years before* the Michael Krasnerman-controlled company, Financial Life Services ("FLS"), purchased the Transamerica policy at the 2012 EDNY court-ordered auction, Douglas Foss, Esq., counsel for FLS and Mr. Krasnerman, sent a September 2, 2010, letter to Nachman Bergman, (Exhibit "7" to Kroll declaration), wherein Mr. Foss stated, among other things, as follows:

> Although the material variation between two life expectance reports is sufficient grounds for FLS, under the terms of the Agreement, to require that you repurchase the Policy, another compelling reason to do so has recently come to our attention. In an affidavit you signed on December 3, 2009, you stated that 'the funds deposited in the account of the Trust used to pay premiums, namely the sum of $1,300,000, were drawn from family funds and used for such purpose." FLS specifically sought, and thereafter relied upon, this representation during its due diligence efforts. ***Our client later confirmed that this policy was actually funded by Jack Herbst to be used as an investment vehicle.*** The statement you made in your affidavit was patently false and, without a doubt, constitutes yet another material representation that was incorrect when made. [emphasis added]
>
> . . .

Thereafter, on October 1, 2010, Financial Life Services, LLC ("FLS") filed an action in United States District Court for the Eastern District of New

York ("EDNY Action") against the N. Bergman Insurance Trust (complaint attached as Exhibit 36 to Mr. Krasnerman's affidavit on file in this action). In the EDNY Action, FLS alleged misrepresentations relating to the insured's life expectancy, payment of premiums and misrepresentations relating to funding of the trust. In addition, FLS alleged that the policy was a stranger-originated life insurance policy ("STOLI") that can result in a policy being voided. [EDNY complaint, ¶ 36]. Moreover, over five (5) years before filing the cross-complaint against the Estate in this action, FLS made the following admission by its allegation in paragraph 36 of the EDNY Action:

> *STOLI transactions are widely considered to be indicia of fraud* in the procurement of a policy.... [emphasis added]

Michael Krasnerman followed-up the allegations in the October 1, 2010 complaint in the EDNY Action with paragraphs 11 and 13 in affidavit, under penalty of perjury, dated January 18, 2011 in the EDNY Action (a true and correct copy of that affidavit is attached as Exhibit "9" to Kroll declaration) that contained the following statements, among others, under penalty of perjury:

. . . .

11. A stranger-originated life insurance policy, commonly known as "STOLI" within the life settlement industry, can result in a policy being voided. STOLI transactions are widely considered to be *indicia of fraud in the procurement of a policy, are illegal* in a number of states, and thus, materially affect the value and marketability of policies on the life settlement market. In entering into the Agreement, FLS relied on Defendant's representation that the Policy was not a STOLI. [emphasis added]

12....

4

13. ***During the summer of 2010***, FLS learned information about the source of funds for the Policy indicating that ***Jack Herbst*** of Acies, Inc. or Acies Life Settlements, ***as well as possibly other investors, invested in the Policy from its inception*** and provided to Defendant funds to be used to pay Policy premiums. Based on this information, FLS learned that Defendant's representation in paragraph 7(bb) of the Agreement and the assurance in Mr. Bergman's affidavit were false. [emphasis added]

. . . .

There is no dispute that these allegation are an admission by FLS, Mr. Krasnerman and through them, the Krasnerman entities, that they believed the policy to be a fraudulent STOLI policy by, at the latest, summer 2010.

In other words, prior to filing the EDNY Action on October 1, 2010 -- two (2) years before FLS purchased the policy at the court-ordered auction, FLS was aware of alleged fraud in the procurement of the policy and sued to rescind the policy due to the fraud.   Having succeeded, FLS, with Mr. Foss at its side, purchased the fraudulent policy at the 2012 auction and jumped into the basket of deplorables with the fraudsters who engineered the fraudulent policy in the first place.  Instead of choosing rescission, cutting their losses and walking away, Mr. Krasnerman and Mr. Foss, tried to capitalize on the fraud. The investors had taken advantage of Nancy Bergman; now Mr. Kranserman and his personally controlled entities, FLS, would take advantage of the investors. They "doubled-down" with FLS's 2012 purchase of the fraudulent policy.

A decision handed down on September 30, 2016, by the Honorable Peter G. Sheridan, United States District Court Judge for the District of New

Jersey, details the scheme argued by the Estate of Nancy Bergman in the SPV action in South Dakota, and found that a policy issued by Sun Life was in fact a STOLI policy (a true and correct copy of that affidavit is attached as Exhibit "10" to Kroll declaration). The *Sun Life* case represented one policy of a total of five life insurance policies in the total amount of $37 million taken out on the life of Nancy Bergman in 2007 from various insurance companies. *Sun Life* decision, Kroll Declaration Exhibit "10", page 4. David Kohn, a licensed representative of Transamerica and other life insurers, established a program allowing strangers to invest in these life insurance policies using trusts as a cover for a wager on the life of Nancy Bergman. Under New Jersey law, the Sun Life policy is void *ab initio*. *Id*. at pages 19-26.

**3.    SPV's Pursuit of Funding Evidence from Initial Investors**

As noted above, SPV brought suit in the U.S. District Court for South Dakota. This was prompted because upon Nancy Bergman's death, Transamerica received competing claims from SPV and the insurance trust. Transamerica interpleaded the life insurance policy proceeds and the South Dakota action will determine who receives $10 million. Upon interpleading the proceeds, Transamerica identified the potential statutory claim of the Estate of Nancy Bergman if the policy was determined to lack an insurable interest at the time it was issued. The insurance trust and others in the line of ownership of the policy were also named as Third-Party Defendants along with the Estate. Cross-claims and counterclaims were brought by parties seeking to establish a basis for receipt of the proceeds or part of it. For its claims against the insurance trust and the Estate, SPV alleges an enterprise consisting of fraud to obtain the life insurance policy and subsequent fraud to avoid the sale to SPV and negate court rulings. The Estate is merely asserting a statutory claim that the policy was void and that any proceeds must be paid to it because there was no insurable interest and Transamerica

has abandoned claims to retaining the proceeds. But before the Estate was formally created by probate proceedings, there were discussions between the family members of Nancy Bergman and advisors who provided advice as to claims against the Estate for Medicare. The only asset of the Estate was a condominium apartment which was subject to a potential Medicare lien. It was not certain whether the Estate should be formally probated. Initial investors in the insurance trust for the Transamerica policy encouraged the family members to formally probate the Estate of Nancy Bergman and appear in the South Dakota litigation.

SPV is seeking to discover all sources of funding for the premiums paid by the trust or Nancy Bergman as part of its claims and defenses. These claims arise in the context of the litigation but have mushroomed at the end of discovery in the South Dakota case. However, as will be shown below, the allegations of SPV do not give it *carte blanche* to subpoena records from third parties for confidential bank account information of opposing counsel. Upon failing to properly serve discovery on the Estate for the records it wants, SPV "jumped the shark" and subpoenaed all personal and business accounts of Gerald Kroll because he is representing the Estate. This was done in the context of a dispute over whether Gerald Kroll should give testimony in the case. Several other attorneys have been subject to questioning in depositions, but none are in the same position as Mr. Kroll. The Estate simply came on the case too late for any of the claims at issue by SPV to be relevant or to create the need for attorney Kroll's bank records.

## 4.    SPV's Overzealous Pursuit of Opposing Attorney Records.

The South Dakota litigation includes a claim relating to fraud by the insurance trust because different people have claimed to be the trustee for the trust. SPV has taken advantage of matters related to alleged fraud or misrepresentations to claim the Estate, and Nachman Bergman, the original

trustee are acting nefariously or collusively. SPV alleges a conspiracy or RICO enterprise among the investors in the insurance trust both to sell him a policy with false information and later to interfere with the policy sale litigation and pursuit of claims to the policy proceeds after Nancy Bergman's passing. SPV seeks to paint the Estate with the same broad brush due to facts establishing communications among some of the same parties who were involved with the insurance trust. The attacks on the investors and trustees have depleted their resources and attorneys have moved to withdraw due to lack of payment. The amount of resources poured into the litigation by SPV is staggering; two law firms with a combined total of over seven (7) lawyers are representing Mr. Krasnerman and his Krasnerman-controlled entities.

Now that the current set of lawyers for current trustee Malka Silberman have filed their motions to withdraw as counsel, Plaintiff has come up with a way to make it a "clean sweep," and eliminate opposing counsel from the case: take the deposition of the Estate's trial counsel, Gerald Kroll, Esq., make him a witness and disqualify him from representing the Estate.

In addition, to the subpoena for testimony (Subpoena attached as Exhibit "1" to Kroll Declaration), Mr. Foss served Mr. Kroll, a sole practitioner, with a subpoena, during these last two weeks of discovery, that blatantly and effectively calls for all of the documents in Mr. Kroll's files (SPV even boldly asks for all communications between counsels of record, Mr. Kroll and Mr. Donahoe), requiring a privilege log, listing each and every item in Mr. Kroll's files.   Most of the document requests are duplicative of requests already served on the client Sym Bergman.   In addition, the nine (9) document request categories in SPV's subpoena in this action are identical to the first nine (9) categories in the subpoena served on Mr. Kroll in the EDNY action. / / /

8

In addition, on or about September 6, 2016, SPV's counsel notified the Estate's counsel that they intended to serve a subpoena to Chase Bank for Mr. Kroll's personal, law firm and trust account bank records, as follows:

> Any and all bank account statements, records of ACH transfers and/or authorizations, and/or cancelled checks from May 2009 through the present associated with any account maintained by Gerald L. Kroll and/or the Kroll Law Corporation, including checking account(s), savings account(s), or otherwise, and including but not limited to that certain JP Morgan Chase Bank account maintained by the Kroll Law Corporation with the account number [redacted here but not in subpoena][and routing number [redacted here but not in subpoena].

## 5. Subpoena of Records and Testimony of Opposing Counsel Was Improper.

Aggressive litigation is one thing; trying to harass the Estate's counsel is another, in contravention of the 8th Circuits pronouncements in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir.1986). This is further evidence that SPV is trying to force the Estate's counsel out of the case.

While Gerald Kroll was in the deposition room in New York City on Friday, August 26, 2016, to represent Sym Bergman, Plaintiff's counsel Doug Foss, Esq. served Gerald Kroll, Esq. with a deposition and document subpoena; at the same moment, Gregory Casamento, Esq., SPV counsel in the U.S. District Court, EDNY action, who was attending the deposition, also served Mr. Kroll with a deposition and document subpoena to take his deposition in the EDNY action. The two depositions were scheduled for September 14, 2016 but were postponed due to timely Motions to Quash currently pending in this Court. The subpoena of Mr. Kroll's bank accounts is simply too much here.

SPV subpoenaed records of Donahoe Law Firm, P.C. and obtained, over objection and pursuant to an Order on a Motion to Compel, its retainer agreement with the Estate through Kroll Law Corporation, and records of payments made by Kroll Law Corporation to Donahoe Law Firm for hourly fees of Brian Donahoe on the South Dakota litigation. That was done several weeks before the Sym Bergman deposition. SPV sought information, which it alleges will tie the Estate to investors in the insurance trust, simply because Mr. Kroll performed his Rule 11 duty to investigate the facts of the case before he agreed to represent the Estate. Because Sym Bergman does not have intimate knowledge of particular investigations, other attorney actions or payments, he could not provide certain testimony. Likewise, some of the information sought is privileged or protected as attorney work product. Unsatisfied and emboldened by rulings on matters not governed by California law, SPV continued to pursue its "scorched earth" policy by subpoenaing opposing counsel's files – and now bank records.

At no time did either attorney file a motion or make any judicial showing that "(1) no other means exist to obtain the information than to depose opposing counsel, (2) the information sought is relevant and nonprivileged, and (3) the information is crucial to the preparation of the case." *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir.1986). This difficult burden imposed by *Shelton* was intended to guard against the "harassing practice of deposing opposing counsel ... that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." *Id.* at 1330.

### a. Further Background to Understand Issues at Stake.

This case is like Michael Krasnserman buying a stolen car, knowing it's stolen. He got a good price.... but he knows he was taking a risk that the car will end up with its true owner. That's what happened here.

10

The Nassau County, New York, Surrogate's Court appointed Sym Bergman as the Executor of the Estate of Nancy Bergman. As such, he is a fiduciary, and is required to gather the Estate's assets. Messrs. Donahoe and Kroll act at the direction of their client, Sym Bergman, the Representative of the Estate of Nancy Bergman. No third party is controlling or directing the Estate counsel's litigation efforts.

The policy proceeds that the Estate recovers in this action belong to the Estate, become an asset of the Estate, and Sym Bergman, as the executor, must manage the money in accordance with his fiduciary obligations under New York state law.

SPV wants to argue about how Mr. Kroll was introduced to Sym Bergman. SPV also tries to claim that our courtesy, in providing the names of local counsel to other parties, is nefarious. But, the Estate's counsel are not coordinating with anyone to give money to the investors, the trust or anyone other than the client, the Estate. Sym Bergman cannot do that, either, because New York law would not allow it.

On or about June 12, 2014, Transamerica filed its answer and Third-Party Complaint in this action (Docket document 6) naming, among others, the Representative of the Estate of Nancy Bergman as a Third Party Defendant. Having thrust the Estate into this litigation, Transamerica alleged, in paragraph 76, that,

> If the Certificate was obtained in violation of state insurance laws governing insurable interest, then the Insured's estate might instead be entitled to the proceeds. Suddenly the Estate was thrust into this litigation.

Since 2009, Gerald Kroll has practiced law in the field of "life settlement" litigation and has been a frequent lecturer on the topic. He has lectured in the United States, and at the International Life Settlement

11

Conference.

A common definition of "life settlement" appears on the website of the Life Insurance Settlement Association:

> A life settlement is the sale of an existing life insurance policy to a third party for more than its cash surrender value but less than its net death benefit.  In a life settlement transaction, the policy's owner transfers ownership of the policy to the buyer in exchange for an immediate cash payment and, in some instances, a reduced interest in the death benefit for the policy's beneficiaries. The buyer of the policy pays all future premium payments and receives the death benefit upon the death of the insured (when the policy matures).

During November 2014, attorney Gerald Kroll first learned about this litigation from an attorney friend, Jule Rousseau, Esq., who introduced Mr. Kroll to Herman Seigal, an individual involved with the Transamerica policy at issue here. Following that introduction, Mr. Kroll commenced his investigation into the matter to determine whether to undertake the representation of the Estate.

As part of his investigation, Mr. Kroll reached out to counsel involved in this action, including Chuck Locke, Esq., whom he understood to be counsel for Transamerica, Ronald Spirn, Esq., whom he understood to be Nancy's Bergman estate planning counsel and counsel for the Estate and Andy Citron, Esq., whom he understood to be counsel for the trust.  Mr. Kroll also met with other individuals, whose names have been disclosed in the parties' Rule 26 disclosures, as part of his work-product effort, to analyze the legal issues involved for the purpose of representing the Estate in the South Dakota litigation.

/ / /

By March 2015, Mr. Kroll understood that Eli Fixler, Esq. -- a New York attorney who worked with the New York Orthodox Jewish community and was familiar with some of the individuals involved here -- was working with the estate in its selection of counsel.

Even Mr. Krasnerman tried to hire Mr. Kroll. [Kroll declaration, paragraph 12].

During April 2015, Mr. Kroll was contacted by Boris Ziser, Esq., of Stroock & Stroock & Lavan LLP, on behalf of Michael Krasnerman to find out if Mr. Kroll was interested in representing Mr. Krasnerman and his companies in this South Dakota litigation. Although he had not yet been retained by the Estate, once Mr. Kroll learned the identity of the potential client and the matter involved, he disclosed that he had already been consulted about the matter for another party, and felt ethically precluded from continuing the conversation. [Kroll declaration, paragraph 12].

During June 16, 2015, Mr. Kroll learned that the Decree for Probate had been signed and that the Letters Testamentary would be received shortly. In an effort to cooperate with Transamerica's counsel and have the Estate joined as soon as possible after he was formally retained, Mr. Kroll was in contact with Charles Locke, Esq., so that arrangements could be made to accept service of process.

By the end of August 2015, Mr. Kroll was formally retained to represent the Representative of the Estate of Nancy Bergman. Mr. Kroll in turn, retained Brian Donahoe, Esq., as local South Dakota counsel. In addition, attorney Eli Fixler, Esq. who was an attorney was involved as counsel, at Sym Bergman's request, to facilitate client communications; Mr. Fixler also served as a non-testifying consultant expert to the Estate's litigation counsel, in addition to a second non-testifying consultant expert working with the Estate's counsel.

### b. Final Background – Meet and Confer Provides Financial Disclosure.

The document and testimonial subpoenas served on Mr. Kroll were resisted and the parties engaged in a "meet and confer" process as required by the Federal Rules of Civil Procedure. In that process, it was learned that SPV was seeking specific financial information that it could have requested from the Estate but either did not, or certainly did not make clear in its Motion to Compel discovery responses and review of supplementary discovery production. Further, the specific issues relating to the cost advance received by the Estate that was sent to the Kroll Law Corporation Trust account boiled down to a desire for records confirming a payment of a cost advance for the Estate (not legal fees) in the South Dakota Transamerica litigation and $2,000 for a cost advance for the Estate for expenses related to Sym Bergman's deposition on a different case, the *Sun Life* matter described above. Without waiving any privilege, and outside the subpoena process, the Estate voluntarily agreed and did produce evidence of receipt of the wire transfer for the $10,000.00 cost advance in this case and the separate receipt of a check for a $2,000 cost advance for expenses related to Sym Bergman's deposition in the Sun Life case.

## ARGUMENTS AND AUTHORITIES

1. **The Deposition Document Subpoena Served on Trial Counsel was Improper, and the Bank Records are an Extension of the Improper Attempt to Obtain Opposing Counsel Information.**

In addition to taking the deposition of Lead Counsel, Gerald Kroll, Plaintiff SPV has served two subpoenas on Mr. Kroll, one in this action and one in the Eastern District action, requesting that Mr. Kroll sit for deposition and produce documents.

/ / /

14

Mr. Kroll is lead counsel for the Estate in this matter pending in South Dakota.

Both the South Dakota Supreme Court and Eighth Circuit have recognized that neither trial nor in-house counsel should be deposed absent compelling circumstances. See Shelton v. Am. Motors Corp., 805 F.2d 1323 (8th Cir. 1986); Vorhees Cattle Co., LLP v. Dakota Feeding Co., LLC, 868 N.W.2d 399, 407 (S.D. 2015) (citing with favor the Shelton Rule and noting that the court must "analyze the necessity for the discovery or consider reasonable alternative sources" for the information). Shelton sets the framework for determination of whether the deposition of an attorney is permissible.

The *Shelton* opinion, *supra*, devotes significant space to a discussion of the perils of deposing any attorney, stating:

> We view the increasing practice of taking opposing counsel's deposition as a negative development in the area of litigation, and one that should be employed only in limited circumstances. Undoubtedly, counsel's task in preparing for trial would be much easier if he could dispense with interrogatories, document requests, and depositions of lay persons, and simply depose opposing counsel in an attempt to identify the information that opposing counsel has decided is relevant and important to his legal theories and strategy. The practice of forcing trial counsel to testify as a witness, however, has long been discouraged, see Hickman v. Taylor, 329 U.S. 495, 513, 91 L. Ed. 451, 67 S. Ct. 385 (1947) (it causes the standards of the profession [to] suffer), and recognized as disrupting the adversarial nature of our judicial system, see id. at 516 (Jackson, J., concurring) (Discovery was hardly intended to enable a learned profession to perform its

15

functions * * * on wits borrowed from the adversary.). Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation.  Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

Id. at 1328.  Ultimately, *Shelton* recognizes that the circumstances under which such a deposition is appropriate "should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and non-privileged; and (3) the information is crucial to the preparation of the case." Id.

There has been no such showing here.  To the extent there is some arguable need for documents and other evidence, those documents are available through party and other witness discovery or would be protected by privilege. And while subpoenaing records of counsel for a party does not make the documents or evidence no longer privileged, the Estate has, in the interests of justice and transparency, determined to make limited waiver of privilege and provided specific financial records as part of the "meet and confer" process required by objections to the deposition and document subpoenas. While doing so, however, the Estate is not waiving any other

privilege in the case.

Each of the categories of documents SPV requested from Mr. Kroll are, generally, either duplicative of document requests already served on the Estate, Mr. Kroll's client or, could have been served on Mr. Kroll's client, the Estate. There is no reason why Plaintiff SPV could not have served the same requests on Mr. Kroll's client, Sym Bergman, who is the Representative of the Estate of Nancy Bergman. Furthermore, it is inappropriate to broadly seek all bank records of opposing counsel just because the client did not have personal knowledge of the specific items requested. The party is considered to have control over those matters in his attorneys' possession, and unless privileged or otherwise protected from discovery as noted above, those items or evidence are subject to discovery requests and shall be produced by the party. The remedy for non-compliance is a Motion to Compel and, if unsatisfied with production after such a motion is granted, a Motion for Contempt. Opposing counsel cannot be compelled to be a witness under these circumstances. And as set forth below, the subpoena is also a way of getting around general scheduling order compliance in this case. That should not be allowed.

## 2. SPV Cannot Use a Subpoena to Avoid Scheduling Order Deadlines in this Case.

Subpoenas on third parties are not to be used to avoid direct requests for production of documents from a party, particularly where issued at the end of the discovery period. In this case, the current Amended Scheduling Order required fact discovery to be completed by September 16, 2016. The subpoena was not served timely to allow sufficient time for Chase to make production by the deadline, but even if it was, the subpoena was issued as an "end around" direct Rule 34 requests for Production on a party, which would have been untimely. This reason alone is sufficient to quash the

17

subpoena for bank records. But because this is a subpoena for bank records – *all* the bank records of opposing counsel – even more legal issues are involved and support quashing the subpoena.

## 3.   The Subpoena Violates Privacy Rights.

SPV's subpoena for the Kroll bank records is not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, the request violates Kroll and Kroll's client's rights to privacy under federal and California law.

A party may move to quash a subpoena where the party has a privacy interest in the documents sought. Windsor v. Martindale, 175 F.R.D. 665, 668 (D. Colo. 1997). While the scope of discovery is very broad, it is not without boundaries. The court has broad discretion to determine relevancy for discovery purposes. Hallett v Morgan, 296 F.3d 732, 751 (9th Cir. 2002).

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Further, relevancy is interpreted "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 427 U.S. 340, 351 (1978).

Unlike the United States constitutional right to privacy, California's constitutional right to privacy is specifically written into the state's constitution. The right to privacy was adopted as a result of a ballot initiative in 1972.

The provision states, "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

18

The party seeking discovery "must identify the particular records that contain pertinent information and, unless it is obvious to a layperson, show why that information must be obtained to resolve the investigation." "The judicial function of assessing cause...cannot be abdicated by referring to the bare conclusions of [the party seeking discovery]." Wood v. Superior Court (1985) 166 Cal.App.3d 1138,1149-50.

In the case at bar, SPV cannot make any showing whatsoever as to how the personal banking records of Kroll are reasonably calculated to bear on any issue that is or may be in the case. The amount of money that Kroll draws as salary, pays for his home, pays for his utilities, or uses for personal expenses has no bearing on this, or any other, action. The only purpose for seeking these records would be to intrude upon the personal life of Kroll simply to either embarrass him or to cause him to choose to abandon his representation of a party in this action. Neither of those reasons are proper bases for conducting discovery.

Likewise, SPV cannot make any showing how the Kroll business banking records would bear on this case. It does not matter what Kroll pays for office rent, telephone expenses, legal research services, payroll, etc. The remaining business banking records would include confidential client information regarding retention, payments, and other miscellaneous information that has no bearing whatsoever on the case at bar. The only purpose for seeking these records would be to obtain a client list (through a back channel) or other trade secret, work product, or confidential client information in an attempt to embarrass other clients or cause Kroll to withdraw from his involvement in this matter. Again, these are not proper bases for discovery.

Article I, Section I of the Constitution of the State of California gives each citizen an "inalienable right" to pursue and obtain privacy. Pioneer

*Electronics v. Superior Court* (2007), 40 Cal.4th 360 states that "the right to be left alone . . . is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us."

Additionally, Burrows v. Superior Court (1974) 13 Cal.3d 238, 243 held that a bank customer has a reasonable expectation of privacy as to matters disclosed to the bank. In the case at bar, Kroll has a reasonable expectation of privacy as to matters disclosed to his bank in the course of his professional businesses and personal business. Additionally, along the same vein as Burrows, Hooser v. Superior Court (2000), 84 Cal.App.4th 997, 1008 held that bank statements relating to an attorney's trust accounts are not discoverable at debtor's exam and that information regarding clients and their funds are protected by the client's right to privacy and that a party seeking such information must show a compelling need.

Hoffmann Corporation v. Superior Court (1985), 172 Cal.App.3d 357 held that a customer list (such as would be provided in an alternative manner by the production of Kroll's businesses banking records) is protected by analogy to a trade secret.

The Court in Tien v. Superior Court (Tenet Healthcare Corp.) (2006) , 139 Cal.App.4th 528  stated that the "identity of persons who consult with counsel implicates their right of privacy" and that disclosure was not justified by a "compelling" need. The Tien Court went on to state, "[t]he court must consider the purpose of the information sought, the effect that disclosure will have on the affected persons and parties, the nature of the objections urged by the party resisting disclosure and availability of alternative, less intrusive means for obtaining the requested information. [Citation.] Based on an application of these factors, the more sensitive the nature of the personal

information that is sought to be discovered, the more substantial the showing of the need for the discovery that will be required before disclosure will be permitted."[citation]."

Furthermore, the Court stated "discovery orders implicating privacy rights are evaluated under the framework established in Hill, and reiterated in Pioneer" Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1. Pioneer Electronics (USA), Inc. v. Superior Court (2007) 40 Cal.4th 360. Alch v. Superior Court (2008), 165 Cal.App.4th 1412, 1423. Informational privacy that is at issue here is the interest in precluding the dissemination or misuse of sensitive or confidential information. Alch, 165 Cal.App.4th at 1423. This class of information is deemed private "when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity." Id. (quoting Hill, 7 Cal.4th at 35).

Accordingly, under California law, the business and personal bank records of Kroll are confidential and Kroll and his clients both have a thoroughly noted and recognized reasonable expectation of privacy in those records. SPV is not entitled to discover those records absent showing of a compelling need. As mentioned earlier, seeking to identify or embarrass Kroll's clients and/or Kroll himself such that Kroll will choose to abandon his involvement in this matter are not compelling interests such that confidential bank records should be produced. Alternatively, if not served for the purpose of harassing Mr. Kroll or to gain an improper advantage, it is simply the wrong way to get the evidence sought. The evidence, if any did exist, should be obtained by sources which do not implicate important privacy interests

/ / /

/ / /

/ / /

21

## CONCLUSION

For the reasons set forth above, the subpoena should be quashed. SPV has any relevant information regarding who paid for any expenses or costs for contingency attorney Gerald L. Kroll. There is no need for his bank records to be exposed and important privacy rights invaded. The subpoena is facially over-broad and plainly is a "fishing expedition." The Motion to Quash should be granted in this case.

Date:  November 18, 2016

McELFISH LAW FIRM

Raymond D. McElfish, Esq.
1112 N. Sherbourne Drive
West Hollywood, CA  90069
Telephone: (310) 659-4900
raymcelfish@mcelfishlaw.com
Attorney for movant Gerald L. Kroll

## CERTIFICATE OF SERVICE

I Rajna Gill hereby certify that on November 18, 2016, the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH SUBPOENA ISSUED TO CHASE BANK, N.A. FOR BANK RECORDS OF GERALD L. KROLL;** was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District Local Rules, and/or the Southern District of New York Rules on Electronic Service upon the following parties and participants:

**Counsel for Financial Life Services, LLC;**
**et al:**
Gregory T. Casamento, Esq.
Jeffrey Kramer, Esq.
Locke Lord Bissell & Liddell, LLP
3 World Financial Center , 20th Floor
New York, NY 10281-2101
212-812-8325
212-947-1202 (fax)
gcasamento@lockelord.com


**Counsel for Malka Silberman:**
Aaron Twersky, Esq.
Twersky PLLC
747 Third Avenue ., 32nd Floor
New York, NY 10017
(212) 425-0149
(212) 355-5009 (fax)
atwersky@twerskylaw.com

**Counsel for Nelson Bloom:**
Jon A. Lefkowitz, Esq.
Jon A. Lefkowitz, Attorney at Law
1222 Avenue M, Suite 204
Brooklyn, NY 11230
(718) 692-0459  (718) 376-2746 (fax)
jonalefkowitz@gmail.com

**Douglas A. Foss**
**Svetlana K. Ivy**
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534
585.419.8779  Direct
585.419.8811  Fax
Email: dfoss@harrisbeach.com
sivy@harrisbeach.com